## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PAMELA JONES, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| THE HARTFORD LIFE AND ACCIDENT | ) |
| INSURANCE COMPANY, | ) |
| | ) |
|     Defendant. | ) |

## COMPLAINT

COMES NOW Plaintiff, Pamela Jones, and for her claims and causes of action against Defendant, The Hartford Life and Accident Insurance Company, states as follows:

## PARTIES

1. Pamela Jones ("Jones") is a resident and citizen of the State of Kansas.

2. Defendant Hartford Life and Accident Insurance Company ("Hartford") is an out-of-state insurance company authorized to do business in the State of Kansas. The Commissioner of the Kansas Department of Insurance is authorized to accept service of process on behalf of Hartford.

## JURISDICTION AND VENUE

3. Jones brings her claim pursuant to the Employment Retirement Income Security Act ("ERISA") and 29 U.S.C. § 1001 *et seq*.

4. This dispute is governed by a welfare benefits plan and its policy documents, as well as applicable federal law regarding employer provided benefits. 29 U.S.C. § 1132(e)(1).

1

5. This Court also has subject matter jurisdiction pursuant to the general jurisdictional statute for civil actions arising under federal law. 28 U.S.C. § 1331.

6. Venue lies in the District of Kansas under 29 U.S.C. § 1332(e)(2), as the breach occurred in this district, and because the welfare benefits plan is administered in this district.

7. Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

## INFORMATION REGARDING TRIAL

8. No jury trial is allowed under ERISA law.

9. Trial is to be held in Kansas City, Kansas.

## STATEMENTS OF FACT

10. National Beverage Company ("NBC") employed Jones as an Assembly Line Production Worker beginning in June 2016.

11. NBC sponsored a group welfare benefits plan ("Plan") for its participating employees, including long-term disability ("LTD") benefits and life insurance benefits.

12. The Plan constitutes employee welfare benefit plans as defined by 29 U.S.C. § 1002(1).

13. The Plan offered benefits to qualifying NBC employee Plan participants, including Jones.

14. At all relevant times, Jones has been a participant and a covered person under the terms of the Plan.

15. NBC is the administrator of the Plan.

16. The Plan's disability and life provisions are insured by policies written by Hartford.

17. NBC delegated or attempted to delegate the function of issuing claim determinations under the Plan to Hartford.

18. NBC and Hartford entered into an administrative services contract through which NBC paid Hartford for acting as claims administrator.

19. Jones enrolled in LTD benefits and basic and supplemental life benefits under the Plan, and Jones was eligible for those benefits.

20. Jones's LTD policy ("the LTD Policy") provides that employees would be entitled to receive LTD benefits if they became "Disabled."

21. The LTD Policy defines "Disabled" as follows:

> **Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:
> 1) Your Occupation, during the Elimination Period and for the 2 years following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
> 2) after that, Any Occupation.
>
> Your Disability must result from:
> 1) accidental bodily injury;
> 2) sickness;
> 3) Mental Illness;
> 4) Substance Abuse; or
> 5) pregnancy.
>
> Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation, alone, does not mean that You are Disabled.

22. The LTD Policy defines "Material and Substantial Duties" as follows:

> **Essential Duty** means a duty that:
> 1) is substantial, not incidental;
> 2) is fundamental or inherent to the occupation; and
> 3) cannot be reasonably omitted or changed.
>
> Your ability to work the number of hours in Your regularly scheduled workweek is an Essential Duty. However, working more than 45 hours per week is not an Essential Duty.

23. Jones's life insurance policy ("Life Policy") allows for the waiver of premiums for life insurance benefits coverage ("LWOP") when a particiapnt becomes "Disabled."

24. The Life Policy defines "Disabled" in the following manner:

> "Disabled: What does Disabled mean?
> Disabled means You are prevented by injury or sickness from doing any work for which You are, or could become, qualified by:
> 1) education;
> 2) training; or
> 3) experience.

25. To receive the Life Policy's LWOP benefits, a participant must satisfy the following conditions:

> Conditions for Qualification: What conditions must I satisfy before I qualify for this provision? To qualify for Waiver of Premium You must:
> 1) be covered under The Policy and be under age 60 when you become Disabled;
> 2) be Disabled and provide Proof of Loss that You have been Disabled for 6 consecutive months, starting on the date You were last Actively at Work or provide proof that You have been diagnosed with a life expectancy of 12 months or less; and
> 3) provide such proof within one year of Your last day of work as an Active Employee.
> In any event, You must have been Actively at Work under The Policy to qualify for Waiver of Premium.
> When Premiums are Waived: When will premiums be waived?
> If We approve Waiver of Premium, We will notify You of the date We will begin to waive premium. In any case, We will not waive premiums for the first 6 month(s) You are Disabled. We have the right to:
> 1) require Proof of Loss that You are Disabled; and
> 2) have You examined at reasonable intervals during the first 2 years after receiving initial Proof of Loss, but not more than once a year after that.
> If You fail to submit any required Proof of Loss or refuse to be examined as required by Us, then Waiver of Premium ceases.

26. Jones's occupation required near constant standing, lifting, and carrying items weighing up to 50 pounds.

27. During her employment, Jones began to suffer from a number of health conditions, including ongoing complications from stroke, sciatica, Degenerative Disk Disease, cervical spine sprain, radiculopathy, bilateral carpal tunnel, bilateral elbow pain, and left shoulder and leg pain. Jones also sustained a torn rotator cuff in 2021, and a fall at work in 2022. These conditions eventually rendered her incapable of continuing her job on a full-time, competitive basis.

28. Jones attempted and failed working for the last day on July 11, 2022.

29. After having to cease work, Jones, through counsel, requested from NBC all plans in which she was enrolled as of her last day working.

30. NBC complied with the request and produced, among other plan documents, the STD and LTD policies.

31. Following this document production, on August 21, 2023, Jones applied to Hartford for long-term disability ("LTD") benefits, submitting a signed application form and a Representation Authorization, and a list of her health care providers. She also provided proof to Hartford that she had applied for SSD benefits.

32. On August 22, 2023, Hartford wrote to Jones advising her that the LTD claim had been received but that more information would be needed to make a decision on her claim. Hartford provided only 15 days to obtain information from her doctor and her employer.

33. On September 22, 2023, Hartford closed Jones's claim and informed Jones it would be reopened only if Hartford received statements from an Attending Physician and from Jones's employer, NBC.

34. On October 11, 2023, Jones provided Hartford with an Attending Physician Statement form from her doctor to Hartford., and on October 14, 2023, provided Hartford with a completed Employer's Statement form.

35. On November 17, 2023, Jones provided Hartford with close to 1000 pages of medical records.

36. On January 8, 2024, Hartford informed Jones that it had denied Jones's claim for LTD benefits.

37. On January 9, 2024, Hartford informed Jones that it had found Jones ineligible for LWOP benefits.

38. On January 17, 2024, Jones requested a copy of her claim file.

39. On July 6, 2024, Jones timely appealed Hartford's denial of her claims for LTD and LWOP benefits and provided medical proof of her disability.

40. On July 9, 2024, Hartford acknowledged Jones's appeal.

41. On February 6, 2021, Jones injured her shoulder after a slip without falling from a ladder.

42. On February 08, 2021, Jones was seen at Concentra Medical Center for strain of the left upper arm or shoulder and acute low back pain with sciatica. She was released to return

        to modified work with lifting restrictions up to 10lbs and sitting 85% of the time and restricted from climbing ladders, reaching above the shoulder, and squatting.

43. On February 11, 2021, Jones was again seen at Concentra Medical Center where she reported worsening pain in the right anterior shoulder radiating into her neck and decreased range of motion. Jones further reported no problems with her shoulder in the past. Jones also reported hip pain with worsening symptoms, sharp in nature and radiating to her left knee. On physical examination there was tenderness in the shoulder, paraspinal L4-S1, left sciatic notch and joint, and distal medial thigh. Dr. Eric Aspinwall opined that Jones suffered acute low back pain with sciatica and strain of the upper arm or shoulder. He then treated Jones with Lidocaine and continued her restrictions and limitations.

44. On February 16, 2021, Jones was again seen at Concentra Medical Center and reported 9/10 pain in her left shoulder and low back Kenneth Krings, DPT continued her restrictions and suggested physical therapy, electrical stimulation, ultrasound, and heat/cold localized pain treatment.

45. On February 18, 2021, Jones was again seen at Concentra Medical Center and evaluated by Gary Park, PTA. Jones reported continued pain in her left hip 8/10 and increased headaches since her injury. On assessment Mr. Park discontinued therapy as Jones was not able to perform the exercises due to pain and would not benefit from therapy.

46. On February 26, 2021, Jones was seen at Diagnostic Imaging for an MRI of her lumbar spine following her fall. The MRI found lumbar disc bulges, facet osteoarthritis at L4-5 and L5-S1, indeterminate renal lesion and left adrenal nodule. Abdominal CT was recommended.

47. On March 3, 2021, Dr. Aspinwall again saw Jones and continued her restrictions.

48. Throughout 2021, Jones continued to see medical providers regularly and complied with treatments including rehabilitation, imaging, shoulder surgery, injections, and physical therapy.

49. In May 2021, Jones underwent physical therapy at Pura Vida Therapy.

50. On August 11, 2021, Jones underwent a left shoulder mini rotator cuff repair including left shoulder arthroscopy with debridement; left shoulder subacromial decompression and acromioplasty. Restrictions included no use of the left upper extremity and remaining in a sling.

51. On November 5, 2021, Jones underwent a left shoulder manipulation due to left shoulder stiffness. Jones was on restrictions of 20 to 25 pounds at waist level from 12/2021 until 06/22/2022.

52. On September 16, 2021, Jones was seen at Kansas City Bone and Joint for follow up on her left shoulder. Jones reported stabbing needle sensations at the incision site with increased pain. On exam there was tenderness and swelling.

53. On September 24, 2021, Jones was seen at Kansas City Bone and Joint for follow up on her left shoulder. Jones continued to have needle sensations at the incision and was on hydrocodone. On examination shoulder forward flexion of the left shoulder was 5 degrees. Pain significantly limited exam and Jones was tearful during the exam. Her elbow was moderately stiff from the sling. Dr. Walker planned to wean from the sling and hydrocodone, and to refer her to the therapist for motion and stretching.

54. From October 5, 2021, to April 15, 2022, Jones underwent physical therapy at Arc Physical therapy. After 18 appointments, of three therapy goals Jones was only able to meet one. As of April 15, 2022, Nicole Grimm, PTA recorded that Jones was not able to

lift 20 pounds from 10 inches to waist 4x and was not capable of replicating light functional lifting requirements. Ms. Grimm records that Jones occupation required light functional lifting, this is incorrect. Jones' occupation required medium functional lifting.

55. On October 11, 2021, a shoulder MRI was performed, showing changes of supraspinatus tendon repair with a single anchor in the anterior aspect of the greater tuberosity, moderate supraspinatus tendinosis with low-grade partial thickness intrasubstance tearing of the posterior fibers at and just medial to the footprint, edema in the posterior fibers of the supraspinatus muscle compatible with a grade 1 muscle strain, low-grade partial thickness intrasubstance tearing of the superior fibers of the subscapularis tendon and just medial to the footprint and mild acromioclavicular joint osteoarthrosis with a small joint effusion. If there are signs and symptoms of infection, then early septic arthritis of the

56. AC joint cannot be entirely excluded. Small amount of fluid distending the subacromial/subdeltoid bursa. Correlate for an infectious or inflammatory bursitis

57. On October 28, 2021, Jones was seen by Dr. Walker for follow up. She was still stiff and was seeing moderate ROM progress due to formal therapy. She was treating with Dr. Bailey for her spine and was experiencing neck pain. Dr. Walker found that based on exam and clinical findings her symptoms were consistent with frozen shoulder. Dr. Walker endorsed restrictions including waist level with no lifting or reaching.

58. On November 5, 2021, Dr. Walker performed a fixation of shoulder manipulation. On December 6, 2021, Dr. Walker saw Jones for a follow up on her shoulder and continued her restrictions to 2-pound weight restriction waist level. On January 20, 2022, Jones saw Dr. Walker for a follow up on her shoulder. Dr. Walker continued restrictions to 20 pounds weight restriction at waist level.

59. On December 16, 2021, Jones was seen by Dr. Jospeh Galate, MD for epidural steroid injections. Dr. Galate recorded that her condition was unchanged.

60. On January 20, 2022, Jones was seen for shoulder therapy, and was limited to lifting 20 pounds, 3 times per week, for 6 weeks.

61. On January 26, 2022, MRI dated January 26, 2022, detailing degenerative changes of the lower lumber spine and lesion in the left kidney. A Renal ultrasound, CT, or MRI of the abdomen was recommended.

62. On February 4, 2022, Jones was seen at Providence Medical Group for follow up on her MRI. Jones reported that her left leg and back pain had not improved. Dr. Appl reviewed the MRI with her and ordered an abdominal CT.

63. On March 3, 2022, Jones was seen by Dr. Walker for shoulder follow up, and restrictions were continued to 20 pounds at waist level.

64. On March 31, 2022, Jones was seen by Dr. Walker and restrictions were increased to 25 pounds to waist level. During her appointment Jones reported pain that she takes ibuprofen for.

65. On April 15, 2022, Nicole Grimm, PTA recorded that following 18 physical therapy visits Jones continued to be limited by pain in the left shoulder and low back. Ms. Grimm deferred to physician recommendations.

66. On April 28, 2022, Jones was seen at Kansas City Bone and Joint and reported occasional shoulder pain worse with lifting objects. Maximum medical improvement was reached, and Jones was advised to see an FCE. Restrictions were continued at 25 pounds to waist level.

67. On May 26, 2022, Jones was seen at Diagnostic Imaging for an abdominal MRI showing a mass in her adrenal glands consistent with adenoma, and multiple cysts in her left kidney.

68. On June 2, 2022, Jones was seen at Providence Medical Group and treated by Dr. Appl for follow up on her MRI. On examination Jones was positive for lower back pain, and her MRI was reviewed. Dr. Appl referred Jones to an orthopedic specialist for suspected L thoracolumbar spasm and suggested rehabilitation.

69. On June 14, 2022, Jones was seen at University of Kansas Health System ("KU") for lower back and left leg pain. Jones reported continued and worsening leg and back pain radiating to the foot. Jones reported worsening symptoms with walking, bending, twisting, and sitting for extended periods. On examination Dr. Douglas Burton found that Jones's ROM was limited and her reflexes were diminished bilaterally. An FCE was suggested, and permanent restrictions were endorsed. Dr. Burton additionally stated he would not change any restrictions previously given.

70. On June 22, 2022, Jones underwent an FCE that reported the heaviest lift bilateral from 15" to waist of 39.7 pounds. Jones's occupation contains a 50 pounds lifting requirement.

71. On July 11, 2022, Jones returned to work temporarily, but was sent home the following day for updated work restrictions from her physician.

72. On August 22, 2022, Jones was seen at Providence Medical Group and treated by Dr. Appl for follow up. Jones was observed to sit leaning to the right due to pain. Dr. Appl completed unemployment paperwork.

73. On February 15, 2023, Jones was seen at Providence Medical Group and treated by Dr. Appl for left leg and lower back pain. Dr. Appl treated Jones with a cortisone injection and discussed an MRI if her symptoms failed to improve.

74. From August 14 to August 17, 2023, Jones was hospitalized at KU after experiencing a stroke and numbness in her left hand, arm, chest, and face. A head MRI was performed that revealed small acute to early subacute right thalamic infarct and minimal nonspecific supratentorial white matter disease likely reflecting chronic microvascular ischemic changes. A CT of the neck was performed showing patent cervical arterial vasculature, and cervical spondylosis with at least mild spinal canal stenosis at C5-C6 and multilevel neural foraminal stenosis of severe degree on the right at C3-C4. An ECG was performed with abnormal ST & T wave, and prolonged QT. Inferolateral ischemia was considered. A Doppler Echo and head CT were also performed. During examination acute mono-arthritis of the left knee was found. Blood pressure was elevated greater than 200.

75. On August 14, 2022, Jones was found to be disabled by the Social Security Administration.

76. On August 20, 2023, Jones underwent an MRI of the left lower extremity at KU finding complex medial meniscal tear with mild peripheral extrusion and small displaced flap fragment in the coronary recess and possibly along the medial tibial spine, tricompartmental low-grade chondrosis, reactive sprain of the MCL with partial tearing of the meniscofemoral and meniscotibial ligament, and ruptured popliteal cyst with edema along the pes anserine.

77. On August 23, 2023, Jones was seen at the KU emergency room for low blood pressure. Jones reported developing L knee swelling that worsened and rendered her unable to

11

walk without a cane. Jones also reported fatigue and light headedness since the morning. On examination she was positive for arthralgias and hypotension. X-ray of the knee was performed showing large knee joint effusion, prominent soft tissue swelling along the medial knee, and chondrocalcinosis of the menisci likely from CPPD. Jones was then admitted. Further testing was performed during her admittance, and arthrocentesis showed pseudogout. On August 25, 2023, Jones was discharged from KU hospital.

78. On September 17, 2023, Jones was seen at KU for knee pain and swelling. Dr. Travis Helberg obtained CBC, CMP, x-ray, and arthrocentesis. The x-ray and MRI were performed finding enlarging left knee joint effusion, diffuse chondrocalcinosis including the menisci and gastrocnemius musculature origins that could be seen in the setting of CPPD arthritis, and mild tricompartmental arthritis of the knee with ossicle along the medial tibial plateau likely from prior injury. Following draining of the knee the discomfort improved and Jones was given colchicine. Jones was advised to follow up with rheumatology.

79. On September 26, 2023, Jones was seen at Providence Medical Group for follow up on her stroke. Jones reported numbness in arms fingers and face. On examination Jones had decreased grip and leg weakness. Dr. Appl opined that Jones will be unable to work due to CVA L Hemiparesis.

80. On September 26, 2023, Jones was seen at Providence Medical Group and treated by Dr. Appl, following her stroke. Dr. Appl recorded that since her stroke her arms, fingers, and face is numb. Dr. Appl opined that Jones would not be able to work due to the stroke.

81. On October 11, 2023, Dr. Bradley completed an Attending Physician Statement opining that Jones was not capable of full-time work and would not be in the future. Dr. Bradley further stated that prior to her stroke in 2023 that Jones had disabling back issues.

82. On January 19, 2024, Sherry Broadhurst, APRN, an ES Exam's, LLC employee performed a medical review of Jones's claim finding that Jones exhibited difficulty squeezing with her left hand, as unable to remove and put on shoes, was able to rise from a seated position with difficulty, was able to walk around a room with an assistive device and antalgic gait, and was unable to heel or toe walk. Broadhurst APRN further found Jones's grip strength to be 4/5 right and 3/5 on the left.

83. On November 9, 2024, Jones was seen by ES Exams for tennis elbow, golf elbow, sciatic nerve, torn rotator cuff, numbness and problems walking. During the exam with an assistive device Jones's gait was antalgic. During the exam Jones was able to rise from a seated position with difficulty and was able to partially squat with difficulty. Jones was not able to heal or toe walk.

84. In response to Jones's appeal on August 6, 2024, Hartford referred her claim for medical review to Dr. Mark Williams, Chiropractor and Hartford Medical Director. Hartford's referral requested responses to eight questions.

85. Hartford also performed an internal vocation analysis and found that Jones's former occupation was medium in exertional level according to the DOT.

86. Dr. Williams August 6, 2024, response did not address any of the eight questions posed by Hartford. Rather his response consisted of a single paragraph in an email stating that he had reviewed the records provided by Hartford and found that Jones was capable of

13

performing at the medium functional capacity level. In support, Dr. Williams cited only a functional capacity evaluation done on June 22, 2022.

87. Dr. Williams questioned the FCE results stating, "during the testing it was noted that full effort was not given. She failed consistency measures on 2/7 tests. There were overt pain behaviors, and her pain questionnaire scores were low for her reports and behaviors." Despite these inconsistencies Dr. William "fe[lt] there was sufficient validity measure and that the conclusion of the examiner [sic] are consistent with the results."

88. Dr. Williams did not explain why he did not consider Dr. Appl's APS, perform a function-by-function analysis, analyze medical records other than the FCE, or otherwise support his conclusion.

89. Dr. Williams also did not explain how he found that Jones was capable of performing medium exertion when the FCE examiner found that her lifting was undeterminable at the time of the examination.

90. On August 20, 2024, Hartford upheld its denial of benefits.

91. Hartford based this second denial on the review performed by Dr. Williams.

92. Jones has at all relevant times met the definition of "Disability" under the Plan and is entitled to benefits.

93. Jones has exhausted her administrative remedies and Hartford refuses to take further action in connection with her claim.

## CAUSES OF ACTION

### COUNT I

### U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF BENEFITS

94. Jones realleges the preceding paragraphs as if fully set forth herein.

95. Jones is entitled to all unpaid and accrued LTD benefits, as Hartford:

    a. Made an unfavorable decision without substantial evidence;

    b. Failed to properly consider Taylor's medical impairments and resulting limitations; and

    c. Issued an unfavorable decision that was arbitrary and capricious.

96. Hartford has not satisfied its obligation to pay Jones's LTD benefits.

97. Hartford denied LTD benefits when the applicable medical record supports upholding LTD benefits.

98. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), Jones prays for judgment against Hartford for unpaid LTD benefits, attorney's fees, costs, and prejudgment interest.

## COUNT II

### U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF BENEFITS

99. Jones realleges the preceding paragraphs as if fully set forth herein.

100. Jones is entitled to all unpaid and accrued LWOP benefits, as Hartford:

    a. Made an unfavorable decision without substantial evidence;

    b. Failed to properly consider Jones's medical impairments and resulting limitations; and

    c. Issued an unfavorable decision that was arbitrary and capricious.

101. Hartford has not satisfied its obligation to pay Jones's LWOP benefits.

102. Hartford denied LWOP benefits when the applicable medical record supports upholding LWOP benefits.

103. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), Jones prays for judgment against Hartford for unpaid LWOP benefits, attorney's fees, costs, and prejudgment interest.

## COUNT III

### U.S.C. § 1132(a)(3) – BREACH OF FIDUCIARY DUTY

104. Jones realleges the preceding paragraphs as if fully set forth herein.

105. Under 29 U.S.C. § 1002(21)(A), a fiduciary is one who:

"exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property or such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

106. 29 U.S.C. § 1104(a)(1)(A) describes the fiduciary standard of care:

"a fiduciary shall discharge her duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

107. Hartford, the Plan's designated claims administrator, is a fiduciary.

108. Hartford participated in and benefitted from the Plan as previously indicated.

109. Hartford's claims management practices are motivated by financial incentives in its administrative services agreement with HCA.

110. As the payor of benefits and the entity responsible for exercising discretion in claims administration, Hartford operates under an inherent conflict of interest.

111. A higher than marketplace quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008) governs the actions of a fiduciary.

112. Hartford breached its fiduciary duty in:

    a. Failing to comply with its internal guidelines and claims handling procedures. Its claim handlers did not comply with documented instructions involving the administration of disability claims, including its procedures involving coverage and eligibility determinations;

    b. Refusing to administer the claim when the 180-day deadline was extended by National Emergency;

    c. Failing to properly administer the claim;

    d. Engaging in a structural conflict of interest by assuming the role of both claims administrator and payor of benefits;

    e. Failing to properly consider competent medical and vocational opinion evidence, and/or failing to specifically explain why it did not agree with such evidence;

    f. Failing to provide a copy of the applicable policy and documents; and

    g. Refusing to utilize fully executed authorizations to attempt to obtain all relevant evidence to Jones's claim for benefits;

113. Hartford denied Jones's LTD benefits for the purpose of elevating its own financial interests. In doing so, it breached its fiduciary duties.

114. Hartford failed to discharge its duties solely in the interests of its participants and beneficiaries. It acted with both a conflict of interest and breached its fiduciary duty to both Jones and the Plan's participants and beneficiaries generally.

115. Hartford's improper conduct demonstrates that ordinary relief under § 1132(a)(1)(B) is not an adequate remedy.

116. Hartford's violations of regulations alone allow Jones the right to pursue any remedy under Section 502(a) of ERISA, including § 1132(a)(3). 29 C.F.R. § 2560.503-1(1)(2)(i).

117. Hartford's violations of federal regulation also subject its decision to de novo review.

118. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(3), § 1109, and § 1132(a)(2), Jones prays for an order that Hartford retrain its employees consistent with ERISA fiduciary obligations and federal regulations; for reformation of its services agreement with the plan administrator consistent with ERISA fiduciary obligations and federal regulations; for an injunction preventing further unlawful acts by Hartford in its fiduciary capacity; for an equitable accounting of benefits that Hartford has withheld; for the disgorgement of profits enjoyed by Hartford in withholding benefits; for restitution under a theory of surcharge; for the Court's imposition of a constructive trust; for an award of attorney fees; and for further relief as the Court deems just.

Respectfully submitted,

BURNETTDRISKILL, Attorneys

By: /s/ Benjamin Narrell
Benjamin Narrell #79228
Derrick Pearce #16752
103 W 26th Ave., Ste. 290
North Kansas City, MO  64116
P: 816.781.4836
F: 816.792.3634
bnarrell@burnettdriskill.com
dpearce@burnettdriskill.com
ATTORNEYS FOR PLAINTIFF